## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LAMAR GURDINE,** | **:** | |
| **Plaintiff** | **:** | **CIV. ACTION NO. 1:23-CV-262** |
| **v.** | **:** | **(JUDGE MANNION)** |
| **BERNADETTE MASON, *et al.*,** | **:** | FILED SCRANTON |
| **Defendants** | **:** | FEB 0 6 2025 |

PER‗‗‗‗‗ ᑌᏦᏟ
DEPUTY CLERK

### MEMORANDUM

Presently before the court in this prisoner civil rights case is defendants' motion for summary judgment. For the reasons set forth below, the motion will be granted, and this case will be closed.

## I. BACKGROUND

Plaintiff, Lamar Gurdine, filed this case on January 24, 2023, in the Schuylkill County Court of Common Pleas. (Doc. 1-1). Defendants removed the case to this district on February 13, 2023, pursuant to 28 U.S.C. § 1441. (Doc. 1). The case was originally assigned to United States District Judge Christopher C. Conner.

Defendants moved to dismiss the original complaint on March 15, 2023. (Doc. 5). The court granted the motion in part and denied it in part on November 17, 2023, dismissing all claims against defendant Mason without

prejudice for failure to allege personal involvement but denying the motion in all other respects. (Docs. 10-11).

Gurdine filed an amended complaint on December 20, 2023, which Mason again moved to dismiss. (Docs. 12-13). The amended complaint asserted claims for violations of Gurdine's rights under the First and Fourteenth Amendments, violations of Gurdine's rights under the Pennsylvania Constitution, and violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (Doc. 12). The court granted the motion on May 8, 2024, dismissing Gurdine's claims against Mason without further leave to amend and allowing the case to proceed solely as to his claims against defendants MacKnight and Scott. (Docs. 20-21). Defendants answered the amended complaint on May 22, 2024. (Doc. 26).

Following the close of fact discovery, the parties filed cross motions for summary judgment on July 30, 2024, and August 6, 2024. (Docs. 30, 34). Briefing on the motions is complete and they are ripe for review. (Docs. 31, 36, 40-41). The case was reassigned to the undersigned on January 21, 2025, following Judge Conner's retirement.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file]

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323-24. The moving party can discharge that burden by showing that "on all the essential elements of

its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23; *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

4

## III. MATERIAL FACTS[1]

Gurdine was incarcerated in Mahanoy State Correctional Institution ("SCI-Mahanoy") at all relevant times. (Doc. 32 ¶6). He is presently incarcerated in Phoenix State Correctional Institution ("SCI-Phoenix"). (*Id.* ¶1). Defendant MacKnight[2] was employed as SCI-Mahanoy's Corrections

---

[1] Local Rule 56.1 requires a motion for summary judgment to "be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried" and requires that the party opposing a motion for summary judgment file a statement responding to the numbered paragraphs in the movant's statement of material facts, which "shall include references to the parts of the record" that support the nonmovant's opposition to the motion. M.D. Pa. L.R. 56.1.

Both parties filed statements of material facts as required by Rule 56.1 in support of their respective motions for summary judgment. (Docs. 32, 35). Defendants, however, did not respond to Gurdine's statement of material facts, and Gurdine filed a document that purports to respond to defendants' statement, but instead of responding to the numbered paragraphs in the statement, it simply gives Gurdine's own conclusory assertions of what legal issues are in dispute. (*See* Doc. 42). Accordingly, because neither party has responded to the other party's statement of material facts in the manner required by Local Rule 56.1, the court deems the facts set out in both statements of material facts admitted. (*See* M.D. Pa. L.R. 56.1). The court will cite directly to the statements of material facts where the relevant factual averment is supported by evidence of record. To the extent the statements are inconsistent with each other, the court will treat the inconsistency as a dispute of fact. The court will additionally cite the currently operative pleadings as to any factual allegations in the amended complaint that defendants admitted in their answer. (*See* Docs. 12, 26).

[2] MacKnight's current last name is Kanjorski. (Doc. 26 ¶5). The court will continue to refer to the defendant as "MacKnight" for the sake of consistency with the caption of this case and prior opinions and orders issued in the case.

Classification and Program Manager ("CCPM") at all relevant times. (Doc. 12 ¶5; Doc. 26 ¶5). Defendant Scott was employed as SCI-Mahanoy's Facility Chaplain Program Director ("FCPD"). (Doc. 12 ¶6; Doc. 26 ¶6).

On September 9, 2019, Gurdine filed a request for religious accommodation requesting a separate religious service for members of the Nation of Islam. (Doc. 12 ¶8; Doc. 26 ¶8). Decisions as to whether to approve a request for religious accommodations are made by the Religious Accommodation Review Committee ("RARC"). (Doc. 32 ¶20). On January 3, 2020, the RARC denied Gurdine's request until an outside faith group leader could be located who could lead a Nation of Islam service. (Doc. 32 ¶18). MacKnight was not a member of the RARC and therefore was not involved in the decision to deny the request. (*Id.* ¶19). In the absence of an outside faith group leader, RARC allowed members of the Nation of Islam to meet communally for 60 minutes a week to practice their religion through various means. (*Id.* ¶21). The relevant policy of the Pennsylvania Department of

Corrections ("DOC"), DC-ADM 819, prohibits group worship by any religious group in the absence of a chaplain or outside faith group leader. (*Id.* ¶22).[3]

The COVID-19 pandemic began approximately two months after RARC denied Gurdine's request for a separate Nation of Islam service and before an outside faith group leader could be located to lead the service. (*Id.* ¶28). Religious services were suspended as a result of the pandemic until November 3, 2021. (*Id.* ¶30). Nation of Islam services did not begin at that time because an outside faith group leader had not been located who could lead the services. (*Id.*) Gurdine sent a written inquiry to defendant Scott regarding Nation of Islam services on November 11, 2021. (*Id.* ¶31). Scott responded on November 16, 2021, that Chaplain Liggitt had tried to find an outside faith group leader to lead the services but that none could be found.

---

[3] Defendants also assert that it is the responsibility of an inmate seeking a separate religious service to locate an outside faith group leader to lead the service and that the religious group to which the inmate belongs must meet certain criteria for the group to be allowed to conduct modified group gatherings absent an outside faith group leader. (Doc. 32 ¶¶24-27). The only evidence they have offered to establish these facts, however, is a declaration from defendant Scott which states these purported policies in conclusory fashion and does not itself cite any written policies of the DOC or SCI-Mahanoy. (*See* Doc. 33-1 ¶¶13-16). The court's review of DC-ADM 819 does not indicate that the policy supports these factual assertions, and defendants have not provided a citation to a specific subsection of the policy that would support the assertions. Accordingly, the court concludes that defendants have not established the absence of a genuine issue of material fact as to these factual assertions.

(*Id.* ¶32). Scott also informed Gurdine that COVID-19 restrictions continued to bar visitors from entering the prison and that religious materials would be available to borrow from the prison's chapel library. (*Id.* ¶¶33-34).

Gurdine was transferred to SCI-Phoenix on June 11, 2024. (*Id.* ¶40). No outside faith group leader was located prior to his transfer who could lead Nation of Islam religious services. (*Id.*) As a result, Nation of Islam services never began in SCI-Mahanoy while Gurdine was there. (*Id.* ¶41). Gurdine has regularly attended Nation of Islam services at SCI-Phoenix since his transfer to that prison. (*Id.* ¶¶46-47).

## IV.    DISCUSSION

Defendants advance five arguments for summary judgment: (1) that Gurdine cannot establish their personal involvement in the alleged civil rights violations; (2) that defendants are entitled to summary judgment to the extent they are sued in their official capacities because such claims are barred by the Eleventh Amendment; (3) that Gurdine's RLUIPA claim is moot because he has been transferred to a different prison; (4) that defendants should be granted summary judgment because Gurdine cannot establish that they violated his freedom of religion; and (5) that Gurdine is not entitled to monetary damages. (Doc. 31). Gurdine concedes that defendants should be granted summary judgment with respect to his RLUIPA claim and his official

8

capacity claims, but otherwise opposes defendants' motion. (Doc. 41). He also moves for summary judgment in his favor because he argues that his constitutional claims succeed on their merits. (Doc. 36).

At the outset, the court will grant summary judgment to defendants on Gurdine's RLUIPA claim and his official capacity claims because Gurdine concedes that summary judgment on these claims is appropriate. (Doc. 41 at 8-9). The court will similarly grant summary judgment as to any claims for injunctive or declaratory relief because those claims were rendered moot when Gurdine was transferred to SCI-Phoenix. *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003). Having done so, the court will grant summary judgment as to Gurdine's claims alleging violation of the Pennsylvania Constitution. The only remaining remedy available for Gurdine's claims is damages, but Pennsylvania law does not allow plaintiffs to recover damages for violation of the Pennsylvania Constitution. *Mt. Airy #1, LLC v. Pa. Dep't of Revenue & Eileen McNulty*, 154 A.3d 268, 280 n.11 (3d Cir. 2016).

The court will additionally grant summary judgment to defendants to the extent that Gurdine has advanced a claim for violation of his right to equal protection under the Fourteenth Amendment. Having reviewed Gurdine's amended complaint, the court does not construe the complaint as advancing any equal protection claim. There is no specific mention of an equal

protection claim in the amended complaint, nor are there any facts alleged from which such a claim could be liberally construed.

To the extent the amended complaint can be construed as asserting an equal protection claim, defendants argue that the claim fails under the so-called "explicit source" or "more specific provision rule." (Doc. 31 at 9 n.4). The court agrees. "Under the more-specific-provision rule, 'if a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision. . . .'" *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 447 (3d Cir. 2020) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). Here, Gurdine's Fourteenth Amendment claim appears to be coextensive with a claim for violation of his First Amendment right to freedom of religion. (*See* Doc. 12 ¶¶21-24). The court will accordingly grant summary judgment to the extent the amended complaint advances an equal protection claim both because the amended complaint fails to state an equal protection claim upon which relief may be granted and because any such claim would fail under the more specific provision rule.

The court's analysis accordingly proceeds to the merits solely with respect to Gurdine's First Amendment freedom of religion claim. The First Amendment states that "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof." U.S.

CONST. amend. I. A prison regulation that impinges on an inmate's First

Amendment rights must be upheld as valid if it is "reasonably related to

legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

To determine whether this standard is met, a court must first determine

"whether there is a valid, rational connection between the prison regulation

and the legitimate interest put forth to justify it." *Fontroy v. Beard*, 559 F.3d

173, 177 (3d Cir. 2009) (quoting *Monroe v. Beard*, 536 F.3d 198, 207 (3d

Cir. 2008)). Although the plaintiff bears the ultimate burden to show that the

regulation is unconstitutional, the defendants bear the initial burden to

establish a rational connection between the prison regulation and a

legitimate penological interest. *Id.* (citing *Monroe*, F.3d 536 at 207).

If a rational connection is shown to exist, the court should then consider

"1) whether inmates have an alternative means of exercising the right; 2) the

burden on prison resources that would be imposed by accommodating the

right; and 3) whether there are alternatives to the regulation that fully

accommodate the inmate's rights at *de minimis* cost to valid penological

objectives." *Id.* (citing *Monroe*, 536 F.3d at 207). However, "[w]here the link

between the regulation at issue and the legitimate government interest is

sufficiently obvious, no evidence may be necessary to evaluate the other *Turner* prongs." *Ramirez v. Pugh*, 379 F.3d 122, 130 (3d Cir. 2004).

In reviewing a challenge to a prison regulation, a court must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Defendants argue that they are entitled to summary judgment on the First Amendment claim because denying separate religious services to a particular faith group when there is no outside faith group leader to lead the services is rationally related to the legitimate penological interest of preventing authority structures from developing between inmates. (Doc. 31 at 12). Gurdine argues that preventing an authority structure between inmates does not constitute a legitimate penological interest because this interest did not actually motivate the decision to deny his request for a separate Nation of Islam service in this case. (Doc. 41 at 11-12).

The court finds that the denial of religious services for the Nation of Islam until an outside faith group leader could be found to lead the services was rationally related to the legitimate penological interest of preventing authority structures from developing between inmates. It is plainly obvious

that allowing a religious service to be conducted without the presence of a faith group leader could allow authority structures to develop between inmates, which is clearly a legitimate security concern for prison officials. *See Smith v. Kyler*, 295 F. App'x 479, 484 (3d Cir. 2008) (concluding that prison regulation "mandating that religious services be supervised by a Chaplain or Faith Group Leader prevents the creation of an authority structure among inmates, [and] thereby contribut[es] to prison security"). The court accordingly concludes that because there is a sufficiently obvious link between the prison's regulation and the legitimate penological interest of preventing authority structures between inmates, no further evidence is necessary to establish the remaining factors in the *Turner* reasonable relation standard. *Ramirez*, 379 F.3d at 130.

Gurdine's contrary argument that defendants' proffered interest of preventing authority structures between inmates did not actually motivate prison officials' actions in this case is not supported by the record. Gurdine has not offered any evidence that establishes that preventing authority structures between inmates was not a motivating factor: the only evidence he cites to support his argument indicates that Nation of Islam services were denied based on the absence of a faith group leader to lead the services. (*See* Doc. 41 at 12; Doc. 41-2 at 43).

13

Moreover, when reviewing whether a prison regulation is reasonably related to a legitimate penological interest, a court does not have to conclude that the proffered penological interest actually motivated the prison's action; rather, the defendants must simply "put forward the legitimate governmental interest alleged to justify the regulation and demonstrate that the policy drafters *could rationally have* seen a connection between the policy and that interest." *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012) (emphasis added) (internal alterations omitted) (quoting *Jones v. Brown*, 461 F.3d 353, 360-61 (3d Cir. 2006)). Here, denial of Nation of Islam services in the absence of a faith group leader could clearly bear a rational connection to the penological interest of preventing authority structures between inmates.

Accordingly, the court concludes that Gurdine cannot meet his burden to show that the denial of Nation of Islam religious services violated his First Amendment rights. The court will grant defendants' motion for summary judgment and deny Gurdine's motion for summary judgment on that basis.

## V.   CONCLUSION

For the foregoing reasons, the court will grant defendants' motion for summary judgment, deny plaintiff's motion for summary judgment, and close this case. An appropriate order shall issue.

Malachy E. Mannion
United States District Judge

**Dated:** 2/6/25

23-262-01

15